**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **SONYA G. CHERRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:07-cv-0079** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Judge Thomas A. Wiseman, Jr.** |
| **COMMISSIONER OF SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Before the Court is Plaintiff Sonya G. Cherry's Motion for Judgment on the Administrative Record (Doc. No. 25) and supporting memorandum (Doc. No. 26) seeking judicial review of the Commissioner's denial of her claim for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The Court withdraws the previous reference to the Magistrate Judge and for the reasons explained below, the Court finds that the ALJ's decision is supported by substantial evidence in the record and that the ALJ applied the correct legal principles in reaching his decision. Accordingly, the Plaintiff's motion will be denied, the Commissioner's decision affirmed, and this matter dismissed.

**I.      INTRODUCTION**

Plaintiff filed her applications for Title II DIB and Title XVI SSI on April 14, 2003, alleging disability resulting from fibromyalgia, depression and bipolar disorder, and a disability onset date for purposes of both applications of February 1, 2002. (*See* Doc. No. 21, Certified Transcript of Administrative Record ("AR"), at 150, 125, 583.) Both applications were denied initially, upon reconsideration, and finally by an administrative law judge ("ALJ") in a decision dated March 26, 2006. (AR 20, 22–30.) Plaintiff filed a timely request for review by the Appeals Council, which was denied on October 25, 2006 (AR 11–13), thereby rendering the ALJ's decision the final decision of the Commissioner.

This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3).

**II.     THE ALJ'S MARCH 26, 2006 DECISION**

Based on his review of the record, ALJ Robert C. Haynes made the following findings of fact and

conclusions of law in the written opinion issued on March 26, 2006:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2007.

2.    The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b) and 416.920(b)).

3.    The claimant has the following severe impairments: bipolar disorder and substance abuse. (20 CFR 404.1520(c) and 416.920(c)[.])

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926).

5.    Based on careful consideration of the entire record, [the ALJ finds that] the claimant has the residual functional capacity to perform at all physical levels with the mental limitations of no detailed or complex tasks, contact with the general public or healthcare duties. Due to her mental impairments, the claimant's mental functioning falls in the 51–55 range on the GAF scale. GAF scores in this range reflect an ability to work and support the above noted mental restrictions.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on August 30, 1965, and was 36 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.    The claimant has not been under a "disability" as defined in the Social Security Act from February 1, 2002, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(AR 23, 25, 26, 29, 30.)

## III.    STANDARD OF REVIEW

Under the Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). This Court, therefore, is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir.

1990).  If substantial evidence supports the ALJ's conclusion and the ALJ applied the correct legal standards, this Court cannot reverse the ALJ's decision even if substantial evidence exists in the record that would have supported an opposite conclusion.  *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995).  Conversely, however, the Court must reverse and remand for further findings if the ALJ applied incorrect legal standards, even if the factual determinations are otherwise supported by substantial evidence and the outcome on remand is unlikely to be different.  *See, e.g.*, *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545, 546 (6th Cir. 2004).  Substantial evidence is more than a scintilla of evidence, but less than a preponderance.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantiality is based on the record taken as a whole.  *See Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

When there has been a misapplication of the regulations or when there is not substantial evidence to support one of the ALJ's factual findings, the appropriate remedy is generally remand under sentence four of 42 U.S.C. § 405(g) for further consideration.  *See Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994).

**IV.     ANALYSIS AND DISCUSSION**

      **A.     Evaluation Of Entitlement To Social Security Benefits**

Under the Social Security Act (the "Act"), a claimant is entitled to receive benefits only if he is deemed "disabled."  42 U.S.C. § 423(d)(1)(A).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

In applying the standards for determining disability, the Secretary has promulgated regulations setting forth a five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520 and 406.920.  An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. See id.  The Sixth Circuit has summarized the steps as follows:

    1.  If claimant is doing substantial gainful activity, he is not disabled.

    2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

    3.  If claimant is not doing substantial gainful activity and is suffering from a severe

impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); 20 C.F.R. § 404.1520(b)-(f).  The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at step five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

  **B.**  **Plaintiff's Contentions of Error**

Plaintiff Sonya Cherry presents the following issues for review:

(1)  Whether the ALJ erred by not giving proper weight to the opinions of the Plaintiff's treating physicians as required by statute, case law and applicable rulings (SSR 96-2p);

(2)  Whether the ALJ erred because his decision impliedly dismissing or minim[izing] the Plaintiff's fibromyalgia was not based upon substantial evidence; and

(3)  Whether the ALJ erred because his medical-vocational analysis minimizing Plaintiff's non-exertional limitations was not supported by substantial evidence.

(See Doc. No. 26, Pl.'s Brief, at 1–2.)

  As set forth above, the question for this Court is whether substantial evidence supports the ALJ's findings and whether he applied the correct legal standards.  *Abbott*, 905 F.2d at 922.  Because of the relatively focused nature of the Plaintiff's arguments, the Court does not find it necessary to provide an exhaustive factual account of the Plaintiff's medical history.  Instead, the Court will consider each of the Plaintiff's enumerated arguments in turn, and will consider those portions of the medical record relevant to her arguments.  The first two issues are overlapping and will be considered together.

  *1.*  ***Whether the ALJ Gave Proper Weight to Plaintiff's Treating Physicians' Diagnosis of Fibromyalgia***

Plaintiff claims that the ALJ failed to give appropriate weight to the opinions of at least three of her treating physicians, Drs. Son Le, Robert Ladd and Felix Adetunji, all of whom treated Plaintiff between July 2002 and October 2003 and all of whom, according to Plaintiff, "diagnosed her with fibromyalgia."

(Pl.'s Brief at 10.)  Plaintiff also contends the ALJ failed to "attribute proper weight to the corroborating opinion of Psychiatrist Sam Castellani, who examined and treated Plaintiff for a period of twenty-six months."  (*Id.*)  In sum, Plaintiff seems to be asserting, first, that the ALJ erred in failing to accept her physicians' conclusion that she in fact suffered from fibromyalgia and, second, that the ALJ erred in failing to consider her fibromyalgia to be a "severe impairment" for purposes of conducting the disability analysis.

As an initial matter, the Court notes that Drs. Ladd and Adetunji did not diagnose Plaintiff as having fibromyalgia, nor did Dr. Castellani "corroborate" the diagnosis, contrary to Plaintiff's assertion.  Dr. Felix Adetunji is a psychiatrist at the Rivergate Psychiatric Center with whom Plaintiff underwent a relatively brief period of treatment, from March 5, 2003 through May 7, 2003.  (AR 223–27.)  In his initial assessment of Plaintiff, Dr. Adetunji noted that, "per [Plaintiff's] own account," she had been diagnosed with fibromyalgia among other problems.  (AR 227.)  He also indicated that Plaintiff's reliability was "questionable."  (*Id.*)  Plaintiff sought treatment with Dr. Ladd at the White House Family Practice for a similarly short period of time, from July 30, 2003 through October 31, 2003.  In Dr. Ladd's office, Plaintiff's primary care provider was Nurse Practitioner Evans.  Plaintiff sought treatment for COPD, asthmatic or chronic bronchitis, sinus problems, gynecological issues, and gastrointestinal disturbance, among other issues, but she also regularly reported back and neck pain and tenderness of the C-spine and L-spine. Her diagnoses included "chronic pain syndrome [secondary] to fibromyalgia," but it is clear that Nurse Practitioner Evans did not actually test for or diagnose fibromyalgia.  Instead, Evans noted Plaintiff's own report of having been diagnosed with fibromyalgia as well as an L4-L5 disc bulge, bipolar disorder, depression, and "sub[stance] abuse - past."  (AR 208.)  The only treatment Plaintiff received from Dr. Ladd's office related to fibromyalgia was a Lortab prescription. There is no indication in the record that Evans (or Dr. Ladd) considered the fibromyalgia, alone or in combination, to be disabling.  Likewise, Dr. Castellani, another psychiatrist, did not do anything to "corroborate" Plaintiff's fibromyalgia diagnosis. Rather, the intake note, specifically Plaintiff's "Past History" form, indicates Plaintiff reported a diagnosis of fibromyalgia.  (AR 574.)  Otherwise, Dr. Castellani's notes over the course of his two years of working with Plaintiff are completely illegible except for occasional nurses' notes, all of which indicate a concern

that Plaintiff was abusing drugs.[1]  To the extent the ALJ failed to credit these physicians' purported diagnoses of fibromyalgia, there was no error in doing so, since none of these physicians actually diagnosed fibromyalgia.  Dr. Ladd's office is the only one of the three to have treated the condition in any way, and the notes from that office do not indicate that Plaintiff's fibromyalgia was regarded as a severe impairment.

Finally, while Plaintiff is correct that Dr. Son Le, at the Center for Spine, Joint and Neuromuscular Rehabilitation, did diagnose Plaintiff as having fibromyalgia in mid-2002, nothing in Dr. Le's treatment notes or the Plaintiff's course of treatment indicate that Dr. Le regarded the condition as severe or disabling.  Dr. Le treated Plaintiff from July 30, 2002 through May 29, 2003.  At his first examination, Plaintiff's chief complaint was recorded to be "general aches and pain."  (AR 248.)  She reported "insidious onset of arthralgia in 2000," and "dull burning ache in her joints, neck and low back," which was worse with stress, bending, standing and "holding head upright."  (Id.)  Plaintiff also reported general weakness and fatigue, "difficulty with heavy house hold chores," inability "to perform duties as fast as she used to," that she was "more sedentary and stay[ed] home more often," and that her "[s]leep and mood [were] affected."  (AR 248, 249.)  Based upon a physical examination that indicated tender points at the bilateral occiput, base of the neck, anterior chest, lateral elbows, low back, lateral hips, and medial knees "consistent with the American College of Rheumatology criteria," Dr. Le diagnosed fibromyalgia in July 2002.  (AR 249.)  His recommended treatment included "strong emphasis on home exercise program," and "referral for psychological counseling, which the patient declined," at least initially.  Dr. Le prescribed Lortab, Flexeril and Celebrex, as well as Effexor.  (Id.)  Over the course of the next eleven months, Plaintiff saw Dr. Le on a monthly basis, received regular trigger-point injections at several points in her mid- and upper-back and later at the sacroiliac joints.  Dr. Le noted that the purpose of the trigger-point injections was to help reduce Plaintiff's narcotic use.  Plaintiff had some ups and downs over the course of her treatment with Dr. Le but was basically stable over this period.  At one point she claimed to have numbness running down the back of one leg and into her foot, but the results of the electrodiagnostic

---

[1]  See, e.g., AR 565 ("10/26/04: Spoke to pt. asked if using cocaine – pt. denied & said they did a test on her & came back + [positive] but it was due to her hydrocodone and she is not using[.]"); AR 568 ("7:00 p.m., 2-5-04:  Spoke [with] Mrs. Jones again [Plaintiff's mother] & she said that Sonya was taking a handful of white pills while in the car today, but she didn't know what they were.  Pt. is still asleep on the sofa.").

study Dr. Le ordered were negative, revealing no evidence of either neuropathy or radiculopathy. Other than trigger-point injections, Dr. Le continued to recommend a psychiatric evaluation, medications including Flexeril, Celebrex and Lortab, a home exercise program as well as aerobic conditioning, weight loss, and stress management. (AR 228–47.) At no point did he communicate a belief that the condition was severe or disabling, or that it prevented Plaintiff from working or engaging in physical activity. To the contrary, his recommendation that Plaintiff engage in a home exercise program and aerobic conditioning suggests that she was not limited physically.

In his written opinion, the ALJ noted in several places that Plaintiff complained of chronic pain and that "she was diagnosed with fibromyalgia based on meeting the trigger point criteria[.]" (AR 25.) In other words, the ALJ accepted that Plaintiff had in fact been diagnosed with fibromyalgia; he did not reject or refuse to accord weight to that diagnosis. The ALJ went on to note, however, that despite that diagnosis, "there were no long term complaints and it does not appear to have affected her daily functioning." (*Id.*) For that reason, the ALJ found that the diagnosis of fibromyalgia did not lead to a "severe physical impairment that imposed significant limitation on functioning for 12 or more months." (*Id.*)

In that regard, Plaintiff next argues that the ALJ "erred because [his] decision impliedly dismissing or mini[mizing] the Plaintiff's fibromyalgia was not based on substantial evidence." (Doc. No. 26, at 13.) Basically, Plaintiff argues that the ALJ improperly found her not to be fully credible. The Court finds, to the contrary, that the ALJ's conclusion that Plaintiff's fibromyalgia did not constitute a severe impairment is corroborated—not contradicted—by Dr. Le's and Dr. Ladd's treatment notes and assessments, and that the ALJ's discounting of Plaintiff's credibility is also supported by the record. While Plaintiff is correct that fibromyalgia *can* be a severe impairment, there is substantial evidence in the record that supports the ALJ's conclusion that, in this particular case, Plaintiff's fibromyalgia is not a severe impairment. Although the ALJ did look to the objective evidence to support that conclusion, including the lack of evidence of radiculopathy, peripheral neuropathy, mononeuropathy, he also considered Plaintiff's behavior, the inconsistency in her reports regarding pain, and her repeated problems with prescription and non-prescription drug abuse. He also considered the fact that none of her treating physicians appeared to believe the fibromyalgia resulted in a severe impairment.

As the Sixth Circuit has noted:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability. . . . [T]here must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from that condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). Here, there is evidence of any underlying medical condition—fibromyalgia—but there is very little objective evidence to confirm the severity of the alleged pain arising from that condition, nor is the existence of the condition itself sufficient to establish that Plaintiff necessarily suffers from a sufficient degree of pain that the condition may be considered a "severe impairment." As the Commissioner points out, there is no evidence that Plaintiff here continued to complain of pain, fatigue and arthralgias to her physicians, and none of her physicians opined that she was physically limited in her ability to perform basic work functions. Moreover, there are numerous indications in the record that Plaintiff was less than truthful about her drug use and that her physicians regarded her as a drug-seeker. In light of that evidence, the ALJ was justified in discrediting to some extent Plaintiff's testimony regarding the alleged severity of her pain.

In short, the Court finds that the ALJ's conclusion that Plaintiff's fibromyalgia did not constitute a "severe impairment" is supported by substantial evidence in the record.

### (2) *Whether the ALJ's Medical-Vocational Analysis Minimizing Plaintiff's Non-Exertional Limitations Is Supported by Substantial Evidence.*

The ALJ found Plaintiff retained the residual functional capacity ("RFC") to work at all physical levels, with no detailed or complex tasks, contact with the general public, or healthcare duties. (AR 26.) Plaintiff argues that the ALJ failed to give sufficient weight to his finding that Plaintiff suffers from bipolar disorder in determining her RFC. More specifically, she asserts that (1) the ALJ erred in discounting the severity of the condition based upon Plaintiff's failure to attend many of her scheduled therapy sessions and (2) that his finding that her mental function fell with the 51–55 range on the Global Assessment of Function ("GAF") scale is not supported by substantial evidence.[2]

As the Commissioner points out, although Plaintiff claims the ALJ improperly discounted the

---

[2] The GAF score refers to the clinician's judgment of the individual's overall level of functioning. *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed.1994) (hereinafter DSM-IV). A GAF score of 40–45 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." DSM-IV at 34. A GAF score of 46–50 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." *Id.* A GAF score of 51–55 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." *Id.*

severity of her bipolar disorder based on her failure to seek regular treatment for the condition, she does not suggest how the condition actually affected her ability to work, or what findings the ALJ should have made in that regard. Moreover, the ALJ clearly articulated the rationale, based on evidence in the record, behind his determination that Plaintiff's GAF fell within the 51–55 range. He thoroughly examined the evidence related to the Plaintiff's mental impairment and the GAF scores in the record throughout the period in question, considering her treating source's evaluations and giving Plaintiff the benefit of the doubt. Generally speaking, the lower GAF scores, which Plaintiff would have the ALJ rely on, were recognized by the ALJ to reflect brief periods of crisis instead of being indicative of Plaintiff's long-term mental functioning. Plaintiff quibbles specifically with the ALJ's decision not to fully credit Dr. Adetunji's assignment of a GAF of 45 on March 19, 2003. However, Dr. Adetunji also noted that Plaintiff's highest GAF over the course of the year was a 61 and he noted that she was "employable," which the ALJ found conflicted with the finding that her GAF score was 45. Plaintiff argues that the ALJ should, instead, have given *her* the benefit of the doubt and concluded that Dr. Adetunji was wrong in saying she was employable rather than that he was wrong in giving her a GAF of 45, but the Court notes that there is no evidence that even Dr. Adetunji believed that the score of 45 reflected Plaintiff's level of functioning over a long term. Moreover, the ALJ's decision to reject the score of 45 was clearly explained and amply supported by other evidence in the record. In reaching that conclusion, the ALJ stated:

> In evaluating the above, although there have been a few brief periods of psychiatric treatment, most of the evidence relates to episodic overdose events and drug abuse. [Claimant] was referred for therapy in early 2002, but failed to show up multiple times. More recently, she was seeing psychiatrist Dr. Castellani, but he discharged her. Generally she has GAF values above 50 except for crisis periods and neither of her psychiatrists have said she is disabled. The most recent caregiver assessed her GAF as 55 and there are other GAF values of 65 and 68 in the record. . . .

> Therefore, with respect to the opinion evidence, Dr. Adetunji, MD, assessed she was employable and independent in activities of daily living in 2003. Although he assessed a current GAF of 45 with a high of 61 for the past year, the GAF of 45 is not supported by his assessment that she was employable; therefore, I do not give this GAF score much weight. On May 24, 2004, Dr. Tang assessed she had a GAF of 55. On October 22, 2005, Mary Parrish, APRN, assessed she had a GAF of 55. On December 29, 2005, she was assessed as having a GAF of 55. Dr. Castellani stated in an October 19, 2005, note that in his opinion DAA [drug and alcohol abuse] was not material; however, he did not find she was disabled. Although there are higher GAF scores in the record, giving the Plaintiff the benefit of the doubt, her treating source's evaluations assessing a GAF of 55 are accepting and that level of functioning on an enduring basis reflects a capability to perform unskilled work. This is supported by Dr. Adetunji's assessment that she was employable and Dr. Tang's assessments.

(AR 28.)  The Court finds that the ALJ's determination in that regard is supported by substantial evidence in the record.

**VI.      CONCLUSION**

For the reasons discussed above, the Court finds that the ALJ applied the appropriate legal standards in reaching his conclusion, and that his decision is supported by substantial evidence in the record.  Plaintiff's claims of error are without merit.

An appropriate order denying Plaintiff's motion for judgment and affirming the Commissioner's decision will issue.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge